**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 15-415** |
| **LEAFORD GEORGE CAMERON** | : | |

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States of America, by and through its attorneys, Louis D. Lappen, United States Attorney for the Eastern District of Pennsylvania, and James A. Petkun, Assistant United States Attorney for the District, hereby submits this trial memorandum in advance of trial set to commence in this matter before the Honorable Gene E.K. Pratter, United States District Judge, on Tuesday, February 6, 2018.

I.   **STATEMENT OF THE CASE**

On September 10, 2015, a grand jury in the Eastern District of Pennsylvania returned an indictment charging defendant Leaford George Cameron with one count of mail fraud, in violation of 18 U.S.C. § 1341 (Count One); two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two and Three); and three counts of false statements, in violation of 18 U.S.C. § 1001 (Counts Four through Six).

The indictment alleged that that for over a decade, defendant Leaford George Cameron engaged in a brazen fraud scheme in which the defendant defrauded his victims by pretending to be Pennsylvania lawyer when, in fact, the defendant was not and has never been an attorney licensed to practice law in Pennsylvania.  To perpetuate his fraud, defendant Cameron stole the attorney identification numbers of four real, actual Pennsylvania lawyers, and used

1

those stolen attorney identification numbers when filings various legal forms and motions on behalf of his victims.

Sadly, the defendant targeted a particularly vulnerable and economically disadvantaged victim population, which included people with immigration-related legal issues, people fighting deportation or removal proceedings, and/or people seeking asylum for themselves or for family members. As the government's evidence at trial will prove, the defendant acted as a professional con-artist, defrauding his victims by providing bogus legal services – and in so doing, the defendant repeatedly tricked judges, other lawyers, and victim "clients" who placed their trust, and their important legal problems, in his hands.

## II.      OVERVIEW OF THE GOVERNMENT'S EVIDENCE

The government's trial evidence will prove the following:  Defendant Leaford George Cameron ran a fraudulent national law practice, pursuant to which defendant Cameron masqueraded as a Pennsylvania lawyer in order to defraud victim "clients" by being paid to be their lawyer in various legal matters.  For years, defendant Cameron fraudulently represented numerous victim "clients" in matters including in various civil cases and in federal immigration matters pending before the Executive Office for Immigration Review ("EOIR"),[1] a component of the U.S. Department of Justice, and U.S. Citizenship and Immigration Services ("USCIS"),[2] a

---

[1]      EOIR, a component of the U.S. Department of Justice, is responsible for administering the immigration courts throughout the United States, and adjudicating immigration cases in proceedings before the immigration courts, in appellate reviews, and in administrative hearings.  In order to represent clients in cases before the immigration courts, an attorney is required to enter his or her appearance by filing a Form EOIR-28 ("EOIR-28"), titled "Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court."  An attorney is permitted to practice before the immigration courts only if the attorney is a member in good standing of the bar of the highest court of any state, possession, territory, or Commonwealth of the United States, or the District of Columbia.

[2]      USCIS, a component of the U.S. Department of Homeland Security ("DHS"), is responsible for performing administrative functions surrounding immigration to the United States, including processing immigrant visa petitions, naturalization petitions, and asylum and refugee applications.  In order to represent an applicant or petitioner in matters before USCIS, an attorney is required to submit a Form G-28 ("G-28"), titled "Notice of Entry

component of the U.S. Department of Homeland Security ("DHS").  The defendant's victims

resided in locations including Pennsylvania, New York, New Jersey, Connecticut, Florida,

Illinois, Jamaica, and India.  Pursuant to his fraudulent law practice, defendant Cameron sought

and received payment from his victim for his fraudulent legal services.  Critically, defendant

Cameron was not, and has never been, a member of the bar of the Commonwealth of

Pennsylvania, nor has he ever been licensed to practice law in Pennsylvania – and further, there

is no evidence that he ever attended or graduated from law school, or has ever been licensed to

practice law anywhere in the United States.

Count One charges the defendant with one count of mail fraud, in violation of 18

U.S.C. § 1341.  This count charges that the defendant, from May 2003 through February 2015,

ran a fraud scheme to obtain money through false and fraudulent pretenses, i.e., that defendant

Cameron used deception and lies to trick the world into believing that he was, in fact, an actual

lawyer so he could illicitly profit.  The government's trial evidence will prove that the defendant

filed motions and forms, wrote letters, and appeared and spoke in immigration court as the

attorney representing his victim "clients" in various legal matters, and that when filing legal

forms and motions, defendant Cameron indicated, often under the penalty of perjury, that he was

an attorney licensed to practice law in the Commonwealth of Pennsylvania.

Defendant Cameron used four stolen Pennsylvania Attorney Identification

Numbers when filing forms and documents in various legal matters.  None of those numbers

belonged to him; these four Pennsylvania Attorney Identification Numbers belonged to victims

---

of Appearance as Attorney or Accredited Representative," for each case in which the attorney sought to appear.   An
attorney is permitted to represent clients in matters before USCIS only if the attorney is a member in good standing
of the bar of the highest court of any state, possession, territory, or Commonwealth of the United States, or of the
District of Columbia.

C.V.H, W.G.H, C.L.H., and K.A.J., all of whom are real, actual Pennsylvania attorneys.  The government's trial evidence will prove that once an attorney in Pennsylvania is licensed to practice law, that attorney is assigned a unique attorney identification number that is never re-used or recycled, and cannot be transferred or assigned to anyone else.  Defendant Cameron has never been licensed to practice law in the Commonwealth of Pennsylvania.

To trick the world into believing that he was a lawyer, defendant Cameron signed his legal forms, documents and letters with the suffix "Esquire" after his name, indicating that he was an attorney.  And to facilitate his crimes, defendant Cameron created a corporate entity to serve as his fake law firm, which he called, at various times during the course of the charged crimes, "Cameron & Associates, P.C.," "Cameron, Hamilton & Associates, P.A.," or "Bernstein, Cameron, Hamilton & Assoc. P.A."   Defendant Cameron sent legal letters on letterhead designed to trick the recipients into believing that defendant Cameron was a real lawyer by using the following methods:  the letterhead (1) included an image of the scales of justice on both sides of the header; (2) listed the defendant's name as "L. George W. Cameron, Esquire," indicating that the defendant was an attorney; (3) listed the names of others fake lawyers at the defendant's fake law firm, those people not actually having anything to do with the law firm (if those people even exist at all; there is no evidence that these names are anything more than a figment of the defendant's imagination); (4) indicated that the defendant's fake law firm had multiple office addresses when, in reality, the defendant's office was his personal residence; (5) the defendant tried to trick the recipient into believing that his home residence was a corporate address by adding the words "Suite B-1," "Suite B-2," and/or a PO Box number.   Further, the defendant's business cards, at various times, matched his letterhead by also showing an image of the scales of justice, listing multiple office locations, adding fake address lines to make the address appear to be a corporate address, and referring to the defendant as "Esquire."

The defendant even went so far as to give the impression that he had administrative staff:  when sending a letter to a victim seeking payment for his fraudulent legal services, the defendant signed the letter as being from "Ann Marie Hyde, Acct. Dept," in order to deceive the recipient into believing that his fake law firm had an accounting department and/or administrative staff.  Defendant has also used other variations of the name "Anne Marie Hyde" – specifically, he has signed letters "Ann Marie Hinds" – when attempting to recoup payment from his victims.

To facilitate his fraudulent law practice, defendant Cameron communicated with victim "clients" and the immigration courts via email, and he also communicated with his victim "clients" via text messages.  From on or about February 9, 2014, to on or about January 29, 2015, defendant Cameron sent twenty-three (23) separate text messages to victim "client" C.L.G., in which he discussed her legal matters and sought payment for his fraudulent legal services.  And from on or about September 13, 2014, to on or about February 2, 2015, defendant Cameron sent twenty-two (22) separate text messages via cell phone to victim "client" A.P.C., in which he discussed her legal matters and sought payment for his fraudulent legal services.

Pursuant to Count One, the defendant is charged with causing to be delivered by the United States Postal Service on or about March 28, 2012, mail according to the directions thereon, and placed in a post office or authorized depository for mail matter, a letter mailed from Philadelphia, Pennsylvania to USCIS in St. Albans, Vermont, as part of his purported and fraudulent legal work on behalf of victim "client" J.J.R. in an immigration matter.

Counts Two and Three charge the defendant with wire fraud, in violation of 18 U.S.C. § 1341, pursuant to the same fraud scheme described in Count One (mail fraud).  Counts Two and Three charge the defendant with sending interstate wires pursuant to his fraud scheme, those interstate wires being text messages to victim C.L.G., the first being sent on or about

January 5, 2015 (Count Two), and the second being sent on or about January 29, 2015.  The government will prove at trial that these text messages were sent by the defendant to victim C.L.G. in Illinois, and that before the text messages were delivered to the victim in Illinois, the text messages were routed through T-Mobile USA's headquarters in in Bellevue, Washington.

Counts Four through Six charge the defendant with making three separate false statements, in violation of 18 U.S.C. § 1001.   Specifically, Count Four charges the defendant with making false statements on or about April 11, 2011 in a Form I-751 ("Petition to Remove Conditions on Residence") in which the defendant indicated that he was a member of the bar of the Commonwealth of Pennsylvania representing victim "client" J.J.R. to the U.S. Department of Homeland Security's USCIS, when in fact the defendant knew that he was not a Pennsylvania attorney; Count Five charges the defendant with making false statements on or about August 23, 2011, in a Form G-28 ("Notice of Entry of Appearance as Attorney or Accredited Representative") in which the defendant indicated that he was a member of the bar of the Commonwealth of Pennsylvania representing victim "client" A.P.C. to the U.S. Department of Homeland Security's USCIS, when in fact the defendant knew that he was not a Pennsylvania attorney; and Count Six charges the defendant with making false statements on or about March 28, 2013 in a Form EOIR-28 ("Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court") in which the defendant indicated that he was a member of the bar of the Commonwealth of Pennsylvania representing victim "client" O.F.G. to the U.S. Department of Justice's EOIR, when in fact the defendant knew that he was not a Pennsylvania attorney.

On March 18, 2015, a federal search warrant was executed on defendant Cameron's residence at One Brook Drive, in Burlington, New Jersey.  Agents of Homeland Security Investigations recovered a variety of physical evidence during the execution of the

search warrant.  The defendant was not present at his home when the warrant was executed; the defendant's wife and adult step-daughter were present at the home.  Defendant Cameron's wife stated that she did not know defendant's whereabouts, that she believed he was a litigator, and that he changes his cell phone number frequently.  She believed that he was in New York.  She provided Homeland Security Investigations ("HSI") Special Agent Thomas Eyre with the defendant's cell phone number.

Agent Eyre thereafter called the number and asked for Mr. Cameron, and Mr. Cameron answered the phone and identified himself.  Agent Eyre introduced himself and stated that he was a federal agent executing a search warrant on Cameron's home.  Defendant Camerons asked why the warrant was being executed, and Agent Eyre explained that defendant Cameron was under investigation for being an attorney-imposter.  Defendant Cameron responded "ok," and Agent Eyre asked defendant Cameron if he was a licensed attorney. Defendant Cameron responded that he was, in fact, a licensed attorney.  Agent Eyre then asked in what state defendant Cameron was licensed to practice law, and defendant Cameron refused to answer.  Defendant Cameron was asked where he went to law school, and defendant Cameron responded in the United Kingdom, but refused to name the university or city.  Agent Eyre indicated that he wanted to give defendant Cameron a target letter, and defendant Cameron stated that Agent Eyre could leave it at the house with his wife, and provided an email address for Agent Eyre to email the target letter.  Agent Eyre left the target letter at the home, and also emailed the target letter to the email address that defendant Cameron provided, "bluelagoonja@msn.com."

On the day that Agent Eyre executed the search warrant, defendant Cameron was on probation for earlier convictions in February 2014, in Delaware County, Pennsylvania, for the crimes of "Unauthorized Practice of Law, Second Offense," and "Theft by Unlawful Taking."  In

7

that case, defendant Cameron was arrested in November 2013; but prior to his arrest, and during the pendency of that investigation, defendant Cameron consensually spoke to local law enforcement.  Defendant Cameron told local law enforcement during that consensual conversation that: he was an attorney; he received his law degree from Cambridge University in London, England; when asked whether he was licensed to practice law in Pennsylvania and New Jersey, Cameron stated that "he should be"; defendant Cameron also stated that he was admitted to practice law in Florida and California as well.

The government intends to introduce at trial evidence including the following: audio recordings of the defendant speaking in open court as an attorney; various self-authenticating copies of public records from EOIR and USCIS in legal matters involving the defendant; various records and files provided to the government by victims in the case, as well as by other attorneys with whom the defendant interacted; various self-authenticating copies of public records from the Pennsylvania Supreme Court regarding the true identity of, and information about, the true owners of the Pennsylvania Attorney Identification Numbers fraudulently used by the defendant; photographic evidence; physical evidence recovered from the defendant's residence during the execution of the search warrant on his home, as well as items recovered from other residences in which the defendant previously resided; digital evidence including text message and email communications between the defendant and his victims; and various statements made by the defendant that are admissible as statements of a party-opponent.

## III.    DISCOVERY

The Due Process Clause requires the government to disclose to a criminal defendant any known information that is both favorable and material to the defense (hereinafter the "Brady doctrine"). *See Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *United States v. Bagley*,

473 U.S. 667, 675-76 (1985); *United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Failing to make the required disclosures may result in the reversal of any affected conviction.

Generally, "favorable" information is either exculpatory or impeaching of the government's witnesses.  (Impeachment information is commonly referred to as "*Giglio*" information.)  "Material" information is information of such significance that, had it been disclosed, there is a reasonable probability that the result would have been different, i.e., that confidence in a guilty verdict would be undermined.  In *Giglio*, the Supreme Court extended the *Brady* ruling to evidence affecting the credibility of the government's witnesses.  405 U.S. at 153-55; *see also Bagley*, 473 U.S. at 676.  Accordingly, failure to disclose material impeachment information violates the defendant's due process rights.  *Brady*, 373 U.S. at 87; *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

The Constitutional obligation to disclose impeachment evidence reaches only information that is favorable to the defendant.  *See, e.g., United States v. Johnson*, 581 F.3d 320, 331 (6th Cir. 2009) ("[T]he Government did not violate *Brady* by failing to inform the defense of the evidence it planned to use to impeach [a defense witness] until after [witness's] direct examination.  The evidence in question was not favorable to Johnson; rather, it called a defense witness's credibility into question."); *United States v. Souffront*, 338 F.3d 809, 824 (7th Cir. 2003) (holding that when an ATF Agent was called by defense, government was not required to disclose that he had been accused of misconduct by a former agent; "Impeaching the testimony of their own witness is not favorable to the defense . . . ."); *Musselman v. Warden*, No. 3:09 cv 407, 2010 WL 1995091, at *3 (S.D. Ohio May 19, 2010) (government was not required to disclose evidence that defendant used fake identification card; "the petitioner cites no case authority suggesting that material useful only to impeach the defendant is *Brady* material.").

9

In the case at bar, the Government has, to the best of its knowledge and ability, complied with Federal Rule of Criminal Procedure 16 and its constitutional obligations under both *Brady v. Maryland*, 397 U.S. 742 (1970), and *Giglio v. United States*, 405 U.S. 150 (1972). Because the defendant has requested discovery under Rule 16, he is obligated to provide reciprocal discovery.[3]  If the defendant fails to provide reciprocal discovery, the government may ask the Court for an order prohibiting the defendant either from referring to or offering such evidence at trial.

Furthermore, Rule 26.2 of the Federal Rules of Criminal Procedure and the Jencks Act, 18 U.S.C. § 3500, require the production of the statements of defense witnesses at trial in essentially the same manner as is required with respect to the statements of government witnesses.  Therefore, any statement given by any defense witness should be provided to government counsel.  *United States v. Nobles*, 422 U.S. 225 (1975) (rejecting notion that the Fifth Amendment renders criminal discovery one-way).

## IV.   STATUTES CHARGED AND ELEMENTS OF THE OFFENSES

### A.   Count One – Mail Fraud (18 U.S.C. § 1341)

Title 18, United States Code, Section 1341 provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . , for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which

---

[3]  The government has made numerous requests for reciprocal discovery in this case over the previous two years.  To date, the defense has provided only one set of discovery by way of a letter dated May 19, 2017, consisting of seven pages relating to Delaware corporate records for entities apparently controlled by, and incorporated by, defendant Cameron.  Because these documents are *not* stamped, signed, or sealed as official public records, the source of these records cannot be determined, thereby calling into question their authenticity and admissibility at trial.

it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

To establish a violation of Section 1341, the government must prove the following elements beyond a reasonable doubt:

(1)     That the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

(2)     That the defendant acted with the intent to defraud; and

(3)     That in advancing, furthering, or carrying out the scheme, the defendant used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Third Circuit Model Jury Instruction 6.18.1341 ("Mail Fraud - Elements of the Offense") (2014).

### B.     Counts Two and Three – Wire Fraud (18 U.S.C. § 1343)

Title 18, United States Code, Section 1343 provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.  To establish a violation of 18 U.S.C. § 1343, the government must prove the following elements beyond a reasonable doubt:

(1)     That the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

(2)     That the defendant acted with the intent to defraud;

11

(3)     That in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

Third Circuit Model Jury Instruction 6.18.1343 ("Wire Fraud - Elements of the Offense").

## C.     <u>Counts Four through Six – False Statements (18 U.S.C. § 1001)</u>

Title 18, United States Code, Section 1001 provides that:

> (a)  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –
>
> > (1)  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> > (2)  makes any materially false, fictitious, or fraudulent statement or representation; or
> > (3)  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years . . . .

18 U.S.C. § 1001.

To establish a violation of Section 1001, the government must prove the following elements beyond a reasonable doubt:

(1)     The defendant [made a false statement] [used a writing that contained a false statement] in a matter within the jurisdiction of the [specify government agency or department];

(2)     The defendant acted knowingly and willfully; and

(3)     The statement was material to the activities or decisions of the [specify government agency or department]; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

No mental state is required with respect to the fact that a matter is within the jurisdiction of a federal agency, and the false statement need not be made directly to the government agency. *United States v. Green*, 745 F.2d 1205, 1208-10 (9th Cir. 1984). There is no requirement that the defendant acted with the intention of influencing the government agency. *United States v. Yermian*, 468 U.S. 63, 73 & n.13 (1984). The initial determination whether the matter is one within the jurisdiction of a department or agency of the United States – apart from the issue of materiality – should be made by the court as a matter of law. *United States v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1518 (7th Cir. 1993).

The Third Circuit recently provided a lengthy analysis regarding the *mens rea*, or scienter, requirement for false statements charges under 18 U.S.C. § 1001 in its opinion in *United States v. Starnes*, 583 F.3d 196, 208-13 (3d Cir. 2009).

In *Starnes*, a defendant argued on appeal that the government had failed to prove, under the "willfulness" element for Section 1001, that the defendant made false statements with "specific intent." Noting that the primary question was determining the meaning of "'knowingly and willfully,' as used in § 1001(a)," the Third Circuit provided a thorough recitation of the relevant history and caselaw on point, ultimately rejecting the defendant's claim that the government had to prove some sort of undefined, amorphous "specific intent." *Id.*

Instead, the *Starnes* court ruled that what the government must prove, in terms of the scienter requirement for a charge of false statements under § 1001, is as follows: (1) that the statements/representations themselves were false, *id.* at 212; and (2) that the defendant possessed "knowledge of the *general unlawfulness* of the conduct at issue", i.e., "that the defendant acted not merely voluntarily, but with a bad purpose, that is, with knowledge that his conduct was, *in some general sense*, unlawful" – but *not* that the defendant "actually knew of § 1001(a)," or knew of the specific law prohibiting the conduct. *Id.* at 210-12 (internal quotation marks and

citations omitted) (emphasis added).  Stated otherwise, "knowingly and willfully" in the context of § 1001 means that the government must show that "the misrepresentation was not made innocently or inadvertently," *id.* at 211 (quoting *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994)), but was made with "knowledge of the general unlawfulness of the conduct at issue," *id.*, as opposed to having to prove "specific knowledge of the law," which the government need not do, *id.* at 211-12 (quoting in parenthetical *Bryan v. United States*, 524 U.S. 184, 193 (1998)). And in *Starnes*, the Third Circuit reiterated the basic principle that proving scienter may be accomplished by drawing reasonable inferences from the evidence of the defendant's conduct. *See id.* at 213 (quoting *Ratzlaff v. United States*, 510 U.S. 135, 149 n.19 (2016) (stating same); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 411 (1950) ("[C]ourts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred."); *United States v. Bank of New Eng., N.A.*, 821 F.2d 844, 854 (1st Cir. 1987) ( "Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts.").

## V.   EVIDENTIARY ISSUES

### A.   Defendant's Statements

The Government intends to offer various statements made by the defendant.  A defendant's statement is never hearsay when offered by the Government.  *See* Fed. R. Evid. 801(d)(2)(A).  Rather, the statement is an admission or a party opponent, and it does not require any special guarantee of trustworthiness.  *See United States v. Singleterry*, 29 F.3d 733, 736 (1st Cir. 1994).  Rule 801(d)(2) "does not limit an admission to a statement against interest."  *United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir. 1993).  For example, in *United States v. Slone*, the Sixth Circuit held that grand jury testimony was admissible as an admission.  833 F.2d 595,

601 (6th Cir. 1987).  The Slone court referred to "the familiar rule of evidence that *any* statement by a party may be offered against him by his opponent." *Id.* (emphasis added).

### B.   Defendant's Attempted Use of His Own Statements

While the government will present defendant's own statements as proper admissions of a party opponent under Federal Rule of Evidence 801(d)(2), such statements may *not* be admitted by the party who gave them – i.e., the defendant – because Rule 801(d)(2) does not allow a party to "to introduce his or her own statements through the testimony of other witnesses."  *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).  Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."  *Id.*  It does not matter whether the information the defendant seeks to admit are inculpatory or exculpatory.  In either case, a party simply cannot admit his or her own statements as admissions of a party opponent.  *United States v. Kapp*, 781 F.2d 1008, 1014 (3d Cir. 1986) (affirming trial court's ruling that tape recording of conversation between codefendant and government informant that defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)).

### C.   Fed. R. Evid. 404(b) Evidence

In the present case, the government filed a motion to admit 404(b) evidence on June 21, 2017 (ECF No. 60), which the Court has taken under advisement and will further rule upon after trial commences.

The government maintains that its 404(b) evidence is classic permissible and appropriate 404(b) evidence to show the defendant's knowledge, intent, lack of mistake or accident, and modus operandi, among other permissible purposes.  The use of this evidence for

appropriate non-propensity reasons was recently expressly approved by an *en banc* panel of the

U.S. Court of Appeal for the Third Circuit in *Langbord v. U.S. Dept. of the Treasury*, 832 F.3d

170 (3d Cir. 2016) (*en banc*) (expressly approving propriety of government's use of 404(b)

evidence for legitimate, non-propensity reasons, such as knowledge and motive).

   The proposed prior bad acts evidence here is, essentially, facts and information

relating to the defendant's having twice before been caught masquerading as a fake Pennsylvania

lawyer to defraud victims in important legal matters.  Defendant Cameron has twice been caught

operating his fraudulent law practice, and twice pleaded guilty to being a fake lawyer: first,

Cameron pleaded guilty on February 24, 1993 in Bucks County, Pennsylvania to one count of

"Unauthorized Practice of Law" and one count of "Theft by Deception"; second, defendant

Cameron pleaded guilty on February 27, 2014 to "Unauthorized Practice of Law – 2nd Offense"

and "Theft by Unlawful Taking" in Delaware County, Pennsylvania.

   Notably, with respect to the 1993 conviction, the government attaches to this Trial

Memorandum as **Exhibit 1** an *extraordinary* 3-page investigative report filed by a Bucks

County law enforcement official, written after the execution of a search warrant on defendant

Cameron's then home/office.  Incredibly, a review of this three-page report (including page 1, in

which Cameron admitted that he was not a lawyer, said he was an "associate member" of the

Pennsylvania Bar, and admitted that he stole another lawyer's attorney identification number;

and page 3, in which the investigator notes that she confiscated *over 100 client files* from

Cameron's fake law firm, and in which Cameron admitted that he was not a lawyer, but that he

had a law practice (*see* **Exhibit 1, Pages 1-3**)) further supports and buttresses the permissible

404(b) reasons to admit non-propensity evidence regarding the 1993 case: namely, the

defendant's *modus operandi* was the same; it shows his *knowledge* that his conduct in the present

case was criminal; it proves his *intent* to commit the charged crimes; and it shows that his conduct was *no accident or mistake*.

The defendant in this case has already asserted that his offense resulted from mistake. Under oath, he told this Court that was not a lawyer, but instead was a "litigation consultant" whose job was to "manage the litigation process" in cases before they would be "turned over" to a real attorney (*see* Tr. 10/1/15 at 17:6-18:9); and after the government *played an audiotape* of the defendant speaking in a 2012 immigration matter, on the record, in a real immigration case, in a real immigration courtroom, which included the defendant telling the immigration judge that taking a nap "made me a better lawyer" (*see* 4/17/17 Tr. at 17:12-14) and that immigration was "not his area of practice" (*see* 4/7/17 Tr. at 17:16), the defendant told this Court under oath that he was not acting as an attorney, but some sort of stand-in (*see* 4/7/17 Tr. at 25:7-25:20). Thus the fact that this defendant has twice before been arrested and convicted for being a fake lawyer when he operated a fake law practice, accepted payments from clients, and worked as a fake lawyer goes directly to his intent, knowledge, lack of mistake, and modus operandi in the present case – all of which are permissible evidence under 404(b). This evidence will fully inform the jury about the plausibility of the defendant's claims of mistake.

Of course the government must prove the defendant's guilt of all elements of the charged crimes beyond a reasonable doubt. And all three of the charged crimes in this case – wire fraud, mail fraud, and false statements – require the government to prove a higher scienter requirement than a general intent crime. Thus, as part of the government's evidence to prove its case, the law expressly permits this sort of appropriate non-propensity evidence to show that defendant Cameron was on specific *notice* that his conduct in the present case was criminal, that he had *knowledge* of his conduct's criminality, that he *intended* to commit these crimes fully

knowing of their illegality, that his conduct was not *accidental*, and that he used the same *modus operandi*, and c*ommon scheme or plan*, here as he did in the two prior cases.

While the Court has reserved ruling on this issue, if the defense's theory of the case – as demonstrated by its opening statement, by questions defense counsel poses to government witnesses, by statements made during any potential defense case, or the like – indicates that the defendant lacked criminal intent, lacked knowledge that his conduct was wrongful, was mistaken as the impropriety of his conduct, or something akin to these sorts of theories, then the government will immediately ask the Court to permit the government to introduce appropriate 404(b) evidence to prove its case, in accordance with Supreme Court and Third Circuit jurisprudence explicitly permitting the use of 404(b) evidence for valid non-propensity purposes.

In many criminal trials, the possibly exists that evidence sought to be introduced by a party may be evidence of other crimes or uncharged conduct.  The admissibility of this type of evidence is governed by Federal Rule of Evidence 404(b), which states:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . *This evidence may be admissible for another purpose,* such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b) (emphasis added).  Rule 404(b) applies to evidence of wrongful acts which are "extrinsic" to the charged offense, and admissible if relevant for any purpose other than to show mere propensity to commit the crime.  Evidence which is "intrinsic" does not fall within the rule.  *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).

In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court set out a four-part test for admission of Rule 404(b) evidence: (1) the evidence must have a proper

purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted. *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003); *see also United States v. Steiner*, 815 F.3d 128, 135 (3d Cir. 2016). The proponent of evidence of prior bad acts "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *United States v. Morley*, 199 F.3d 129, 133 (3d Cir. 1999); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994).[4] Proper evidentiary purposes for prior bad acts evidence includes: (1) the defendant's motive; (2) intent and knowledge; (3) the absence of mistake of accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; or to (5) establish identity. *Green*, 617 F.3d at 242. However, prior bad acts are also admissible for reasons not specifically enumerated in Rule 404(b), including those necessary to "complete the story," provide proper background information without which the trial would not make sense, or to supply a jury with "helpful background" information needed to fully understand the events charged in the indictment. *Green*, 617 F.3d at 250; *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir. 1982) (prior check forging admissible under Rule 404(b) "to provide necessary background information"); *United States v. Taylor*, 522 F.3d 731, 735-36 (7th Cir. 2008) (it is proper under Rule 404(b) to admit evidence in order to "avoid confusing the jury"); *United States v. Middleton*, 246 F.3d 825, 836 (6th Cir. 2001) (defendant's previously filed tax returns

---

[4] "The parameters of Rule 404(b) are not set by the defense's theory of the case; they are set by the material issues and facts the government must prove to obtain a conviction." *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992). Indeed, the government, at the time it presents its case-in-chief, often does not know precisely what defense will be offered or even if the defendant will present any case at all. *United States v. Ferrer-Cruz*, 899 F.2d at 139.

ruled admissible to establish the defendant's knowledge of his legal duty to pay taxes); *United States v. Lashmett*, 965 F.2d 179, 184-85 (7th Cir. 1992) (defendant's incarceration established his motive to recruit others in the fraud scheme, and "filled a chronological gap in the case" by explaining his physical absence during the period of incarceration).  As the Third Circuit held in *Green*, "allowing the jury to understand the circumstances surrounding the charged crime[s] – completing the story – is a proper, non-propensity purpose under Rule 404(b)."  617 F.3d at 247.

### D.   Admissibility of Evidence

In criminal fraud trials, it is customary for government counsel to offer numerous documents into evidence.  Although government counsel has requested that the defendant stipulate to the admissibility of many of these documents, counsel is presenting a brief discussion of certain issues regarding the admissibility of various documents that may be offered in this case in the event that the defendant does not agree to a stipulation regarding the authenticity and non-hearsay nature of the subject documents.

### 1.   Certified Public Records

Government counsel will offer certified copies of domestic public government records from sources including USCIS (within the U.S. Department of Homeland Security), EOIR (within the U.S. Department of Justice), and the Disciplinary Board of the Supreme Court of Pennsylvania.  These documents are self-authenticating under Federal Rule of Evidence 902(4), and are admissible under the hearsay exception for public records set forth in Federal Rule of Evidence 803(8).  *See United States v. Blunt*, 2017 WL 6527148, at *2 (M.D. Pa. Dec. 21, 2017) (trial court "was correct in overruling [defendant's] hearsay objection [because] a driver's license is an admissible public record in accordance with Federal Rule of Evidence 803(8)."); *Parker v. United States*, 1993 WL 300184, at *3 n.6 (W.D. Mich. May 10, 1993) (certified tax records "are self-authenticating under Fed. R. Evid. 902(1).  And, separately, many

of these public records are being introduced to show statements made by the defendant himself within those documents, and thus also constitute non-hearsay statements of a party opponent under Rule 801(d)(2)(A).  Consequently, a representative of these government agencies need not be called at trial to authenticate these records and evidence.

## 2.    <u>Business Records</u>

Government counsel will also offer business records, such as bank records, as evidence pursuant to Federal Rule of Evidence 803(6), as an exception to the hearsay rule. To qualify for admissibility under Federal Rule of Evidence 803(6), a business record must satisfy the following four requirements:  (1) the record must have been made in the course of a regularly conducted business activity; (2) the record must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.  *See United States v. Salgado*, 250 F.3d 438, 451 (6th Cir. 2001); *United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998).   Business records meeting these criteria are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."  *Id*. "Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record."  *Weinstock*, 153 F.3d at 276.  The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's record keeping practice.  *Id*. (citing *In Re Custodian of Records of Variety Distri., Inc.*, 927 F.2d 244, 248 (6th Cir. 1991)).  Likewise, "[t]o be an 'other qualified witness,' it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation."  *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (6th Cir. 1999).

Business records integrated into an office's records and relied upon in its day-to-day activities are admissible under Rule 803(6).  *United States v. Mendel*, 746 F.2d 155, 166 (2d Cir. 1984); *see also United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992) (fact that business record was from another business was "irrelevant" because business owner relied upon the document).

Under certain circumstances, the requirements for admission of a business record may be met without testimony of a custodian or other witness.  *See, e.g.*, Fed. R. Evid. 902(11) – Certified Domestic Records of Regularly Conducted Activity.  The Government may use Rule 902(11) certifications in this case.  The foundational requirements of Rule 803(b)(6) may also be met by other documentary evidence, affidavits, or admissions; or the admissibility may "be established if the court takes judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank statements and similar statements."  5 Weinstein's Evidence ¶ 803.08[8][c], at 803-85 (2009).

### 3.    Photocopies and Other Duplicates

Many of the documents that the Government intends to offer into evidence are photocopies of documents.  Photocopies are admissible pursuant to Federal Rules of Evidence 1002 and 1003.  Federal Rules of Evidence 1002 provides that "[t]o prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."  Furthermore, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances if would be unfair to admit the duplicate in lieu of the original."  Fed. R. Evid. 1003.  Microfilm and other prints are admissible to the same extent as originals whether the original is in existence or not.  28 U.S.C. § 1732(b) (Federal

22

Business Record Act).  Therefore, microfilm reproduction of bank statements, checks, and deposit tickets are admissible in the same manner as the originals.  *United States v. Saputski*, 496 F.2d 140, 141-42 (9th Cir. 1974).

### 4.      Summary Charts

The government plans to use at trial certain summaries and charts at trial.  District Courts have routinely allowed the Government to introduce charts and summaries based on the evidence.  *See United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980); *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979); see also Fed. R. Evid. 1006 (specifically permitting the use of charts and summaries, even when the underlying records are not produced in court). These summary charts may be used by the jury during deliberations.  *See United States v. Silverman*, 449 F.2d 1341, 1346 (2d Cir. 1971).

There are two categories of charts under the rules – summary charts and demonstrative charts. Summary charts are admissible at trial, pursuant to Fed. R. Evid. 1006, to summarize voluminous documents, which need not have been previously admitted into evidence, because in-court review of those documents would be inconvenient or impracticable. Demonstrative charts, on the other hand, are allowed under Fed. R. Evid. 611(a) to summarize or otherwise aid the jury's understanding of complex documents or testimony which have already been admitted into evidence.

First, regarding summary charts: Fed. R. Evid. 1006 allows a party to prove the contents of voluminous writings by presenting evidence of the contents of those documents in the form of charts, summaries or calculations.  *See United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992); Fed. R. Evid. 1006 (allowing a party to introduce a chart summarizing "[t]he contents of voluminous writings . . . that cannot conveniently be examined in court.").   The

language of Rule 1006 "recognizes that it often takes a great deal of court time to introduce a legion of documents to establish a single point.  As the Advisory Committee notes indicate, it would be a grueling waste of time to examine all of the underlying evidence in court, and hence charts and summaries are permitted."  *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990). L.Ed.2d 121 (1991).  To be admissible, a summary chart must summarize documents so voluminous "as to make comprehension 'difficult and . . . inconvenient,'" although not necessarily "literally impossible"; the documents themselves must be admissible, although the offering party *need not actually enter them into evidence*; the party introducing the chart must make the underlying documents reasonably available for inspection and copying; and the chart must be "accurate and nonprejudicial."  *United States v. Hemphill*, 514 F.3d 1350, 1358-59 (D.C. Cir. 2008) (quoting *United States v. Bray*, 139 F.3d 1104, 1109-10 (6th Cir. 1998).

Importantly, the government is *not* required to introduce the underlying records on which a summary chart is based.  In *Hemphill*, the U.S. Court of Appeals for the D.C. Circuit rejected a defendant's argument that the underlying records were required to be admitted at trial.  *Id.*, 514 F.3d at 1358-59.  The D.C. Circuit noted that the defendant's argument was based on the "misapprehension that the government must actually introduce the documents on which it bases a summary chart," *id.*, and held: "To the contrary, the point of Rule 1006 is to *avoid* introducing all the documents."  *Id.* at 1369.  "One of the most significant aspects of Rule 1006 is that there is no prerequisite that the underlying documents have been submitted into evidence."  *United States v. Bertoli*, 854 F.Supp. 975, 1050-51 (D.N.J. 1994), *aff'd in part, vacated in part,* 40 F.3d 1384 (3d Cir. 1994).  "Upon being found admissible under Rule 1006, the summary charts are considered evidence."  *Id.* at 1051 (citing United States v. Winn, 948 F.2d 145, 158 (5th Cir. 1991) ("In fact, summaries admitted pursuant to Rule 1006 *are evidence*." (emphasis added))).

And where a summary chart "summarizes data not in evidence, the chart is the only evidence available for the jury's consideration of the matters set forth therein." *Id.*

Second, compilations or charts which are used only to summarize or organize testimony or documents *which have themselves been admitted into evidence* are distinguished from those used as evidence pursuant to Rule 1006. Where the summaries or charts are "pedagogical devices 'more akin to argument than evidence' [because] they organize the jury's examination of testimony and documents already admitted into evidence," they do not come within Rule 1006. *Bertoli*, 854 F.Supp. at 1053 (quoting *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991). "These pedagogical devices, unlike Rule 1006 summaries, are not evidence, but only a party's organization of the evidence already presented." *Id.* The difference between Rule 1006 summary charts and demonstrative charts has been explained as follows:

> [T]here is a distinction between a Rule 1006 summary and a so-called "pedagogical" summary. The former is admitted as substantive evidence, without requiring that the underlying documents themselves be in evidence; the latter is simply a demonstrative aid which undertakes to summarize or organize other evidence already admitted. . . . [A] pedagogical summary can itself be admitted into evidence where the trier of fact will find it helpful and will not be unduly influenced thereby.

*Id.* (quoting *White Indus. v. Cessna Aircraft Co*., 611 F.Supp. 1049, 1069–70 (W.D. Mo. 1985). Rule 611(a), which permits trial judges to make common-sense determinations as to how the trial should be run, allows the introduction of demonstrative summaries and charts. *Id.* As discussed in the Advisory Committee's Note to Rule 611, the rule covers such matters as the presentation of evidence, the use of demonstrative evidence and "the many other questions arising during the course of a trial which can be solved only by the judge's common sense and fairness in view of the particular circumstances." Fed. R. Evid. 611 Advisory Committee's Note. Demonstrative evidence "is universally offered and submitted as an aid to understanding." Fed. R. Evid. 401

25

Advisory Committee's Note.  The use of demonstrative charts to "aid the jury's comprehension is well within the court's discretion."  *Bertoli*, 854 F.Supp. at 1053 (citations omitted).  "However, when Rule 611 charts are used, it is required the charts be accompanied by an instruction from the court which 'informs the jury of the summary's purpose and that it does not constitute evidence.'"  *Id.* (quoting *Paulino*, 935 F.2d at 753).

The Third Circuit addressed the use of Rule 1006 summary charts in *United States v. Pelullo,* 964 F.2d 193 (3d Cir. 1992).  Summaries may be in the form of (1) primary-evidence summaries; (2) pedagogical-device summaries or illustrations; and (3) secondary evidence summaries that are a combination of (1) and (2) in that they are not prepared entirely in compliance with Rule 1006 and yet are more than mere pedagogical devices designed to simply and clarify other evidence in the case.  The summaries rather than the underlying documents are to be considered evidence.  *See* 1 Edward J. Devitt et al., *Federal Jury Practice and Instructions* § 14.02 (4th ed. 1992); 1 Leonard B. Sand et al., *Modern Federal Jury Instructions (Criminal)* § 5.05, at 5-34 (1997).  These documents are properly admissible as evidence without a limiting instruction.  *United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998).

## E.   Hostile Witnesses

As part of its case-in-chief, the Government will may present individuals who may be aligned with the defendant.  Federal Rule of Evidence 611(c) provides:  "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."  Fed. R. Evid. 611(c).  The comments to Rule 611(c) suggest that leading questions are proper when a witness is unwilling or biased, and describe the phrase "witnesses identified with an adverse party" as an attempt to enlarge the category of persons described as hostile.

26

A hostile witness, in the jargon of evidence law, is not an adverse party but a witness who shows himself or herself so adverse to answering questions, whatever the source of the antagonism, that leading questions may be used to press the questions home.  *Rodriguez v. Banco Central Corp.*, 990 F.2d 7, 12-13 (1st Cir. 1993); *cf. Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) (leading questions permitted on direct examination of adverse party). Accordingly, the Government will request permission to use leading questions if a witness displays these qualities.

**F.      Residual Exception to the Hearsay Rule**

The Government may, if necessary, seek under Federal Rule of Evidence 807 the admission of certain out-of-court statements that are not admitted pursuant to the business records exception, Rule 803(6), or any other applicable rules of evidence.   Under Rule 807, the Government must establish (a) that the statement is offered as evidence of a material fact; (b) that the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of the rules and the interests of justice will best be served by admission of the statement into evidence. *See United States v. Darwich*, 337 F.3d 645, 659 n.15 (6th Cir. 2003).   Here, the Government will seek to introduce many documents as business records and certified copies of public records. If the Court finds that any of these documents are not admissible pursuant to the these rules, however, the Government will seek to introduce these documents pursuant to Rule 807.

The general purposes of the rules of evidence and interests of justice would also be served by admission of these documents into evidence.  Whether the purposes of the rules and the interests of justice are served by the admission of these documents is determined by whether these statements have "equivalent circumstantial guarantees of trustworthiness."  *See United*

*States v. Weinstock*, 863 F. Supp. 1529, 1535 (D. Utah 1994).  Equivalent circumstantial

guarantees of trustworthiness can be met by corroboration.  In *Hopkinson v. Shillinger*,

independent corroboration of a murder victim's out-of-court statements was deemed to be an

"important indicium of reliability in the Confrontation Clause analysis."  866 F.2d 1185, 1201-03

(10th Cir. 1989).

   Another equivalent circumstantial guarantee of trustworthiness is the way in

which the statements were made.  In *United States v. Wright*, a diary that was regularly

maintained and contained self-incriminatory entries was deemed to be admissible under the

residual hearsay exception.  826 F.2d 938, 946 (10th Cir. 1987).  Other cases in which diaries

were held admissible under the residual hearsay exception include *United States v. Sheets*, 125

F.R.D. 172, 176 (D. Utah 1989), *United States v. Treff*, 924 F.2d 975, 983 (10th Cir. 1991), and

*United States v. McPartlin*, 595 F.2d 1321, 1350 (7th Cir. 1979).  In another case, a document

from the Iraqi Intelligence Service, which was not necessarily within the business records

exception, was admitted under the residual exception.  *United States v. Dumeisi*, 424 F.3d 566,

574-76 (7th Cir. 2005).

   The general purposes of the rules of evidence and interests of justice would be

served by the admission of these documents under the residual exception because such admission

would be "consistent with the general requirement in the rule to provide a speedy, inexpensive

and fair trial designed to reach the truth."  *United States v. Munoz*, 16 F.3d 1116, 1122 (11th Cir.

1994).

   **G.**  <u>**Use of Notes and Reports to Cross-Examine**</u>

   The government in this case has provided reports of witness interviews by

government agents.  To the extent that the agents who prepared the reports testify, those reports,

if materially inconsistent, provide an appropriate basis for impeachment of the agents.  However,

under the Federal Rules of Evidence, those notes or reports may *not* be used to impeach the

subject of the underlying interview unless the subject has somehow adopted those reports or

notes.  *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

> In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he

had obtained from two defendants who were being tried.  *Id*. at 28.  One defendant sought to

cross-examine the agent with interview notes taken by an Assistant U.S. Attorney who had

interviewed the agent.  *Id*. at 28-29.  The district court rejected the effort, and the Second Circuit

affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third

party's characterization" of the agent's statement, and therefore irrelevant to impeachment and

consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's
> statement does not constitute a prior statement of that witness unless the witness
> has subscribed to that characterization. . . .  Thus, in the absence of endorsement by
> the witness, a third party's notes of a witness's statement may not be admitted as a
> prior inconsistent statement unless they are a verbatim transcript of the witness's
> own words.  The problem, in essence, is one of relevancy.  If a third party's notes
> reflect only that note-taker's summary characterization of a witness's prior
> statement, then the notes are irrelevant as an impeaching prior inconsistent
> statement, and thus inadmissible.

*Id*. at 29 (citation omitted).  As a matter of evidence, the burden "of proving that notes

reflect the witness's own words rather than the note-taker's characterization falls on the

party seeking to introduce the notes."  *Id*.  Thus, a party seeking to use a report to impeach

bears the burden of proving a rational basis for concluding that the report either was

adopted by witness or represents the verbatim transcript of the witness' statement.  *See id.*

at 30.  In the absence of such proof, cross-examination from such reports or notes should

be disallowed.  *See United States v. Shoenborn*, 4 F.3d 1424, 1427-28 & n.3 (7th Cir. 1993).

- 29 -

In this case, the defendant should not be permitted to use reports to cross-examine the underlying subjects of those interviews.

### H.      Defense Character Witnesses

The defense may intend to call character witnesses at trial.  Federal Rule of Evidence 404(a)(1) permits a defendant to offer evidence of a "pertinent character trait" at trial. Rule 405(a) governs the admission and presentation of this type of evidence.  The Rule permits only two types of inquiry by the defendant: whether the witness is aware of the defendant's reputation in the community for a pertinent character trait, or whether the witness has an opinion regarding a pertinent character trait of the defendant.  *Michelson v. United States*, 335 U.S. 469, 477 (1948).  On direct examination, "the witness may not testify about defendant's specific acts or courses of conduct."  *Id.*  Hence, a character witness is forbidden from detailing a defendant's specific acts of good conduct or lack of bad conduct.  *See Government of Virgin Islands v. Grant*, 775 F.2d 508, 512 (3d Cir. 1985) ("Rule 405(a) does not [permit] . . . an exception for accused persons seeking to prove their good character by specific acts.")

The only possible pertinent character traits which could be at issue in this matter are the defendant's character for truthfulness or honesty.  *See Michelson*, 335 U.S. at 483.  Once the defendant calls such character witnesses to testify about these matters, the government is permitted to cross-examine these witnesses about specific instances of conduct of the defendants to test the validity and weight of the witness's opinion or the knowledge of the defendant's reputation.  *Michelson*, 335 U.S. at 479.  Indeed, Rule 405(a) specifically provides that "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct."  These specific instances of conduct may be anything which the community in which the defendant has the reputation or which a person who has an opinion about the defendant's character would tend

to discuss. *Id*.

Any relevant specific instance of conduct that would bear on the proffered character trait is permitted as long as the prosecutor has a good-faith basis for believing that the event in question occurred and that it would be type of event about which people normally comment or speculate. *Michelson*, 335 U.S. at 479, 481 & n.18; *United States v. Green*, 305 F.3d 422, 431 (6th Cir. 2002). Because a person's reputation is made up of the collective positive and negative things that people say about the person, whether or not they are grounded, and because the government must be able to "test the qualifications of the witness to bespeak the community opinion," inquiry on cross-examination is necessarily broad. *Michelson*, 335 U.S. at 483. Indeed, jurors may rightfully doubt whether a witness is capable of giving reliable information about a defendant's reputation if he or she has never heard speculation and rumor about the defendant. *Id*.; *Grant*, 775 F.2d at 511 n.4.

Similarly, witnesses who testify regarding their opinions about the defendant's character are properly subject to challenge by cross-examining them about their knowledge of relevant specific instances of the defendant's conduct. *See United States v. Monteleone*, 77 F.3d 1086, 1089 (8th Cir. 1996). This cross-examination is permitted because if the witness knows about these specific instances and still has formed a positive opinion about the defendant, that witness's testimony may be properly discounted by the jury. Likewise, if the witness is not aware of these specific instances or did not take them into account when forming his or her opinion, the jury *may rightfully question whether the witness knows enough to form a reliable opinion. Cf. Monteleone*, 77 F.3d at 1089; *accord United States v. Bruguier*, 161 F.3d 1145, 1148 (8th Cir. 1999). Permitting such questioning prevents the defendant from misleading the jury into thinking that they have good character. Indeed, as the Supreme Court has held, to

- 31 -

permit a defendant to introduce character evidence without permitting the government such cross-examination would be particularly unfair and "give the defendant the benefit of testimony that he was honest and law-abiding in reputation when such might not be the fact. *Michelson*, 335 U.S. at 483. Accordingly, "if . . . direct testimony is addressed to community reputation, inquiry may be made about conduct, and even about charges, which may come to the attention of the relevant community." *United States v. Curtis*, 644 F.2d 263, 268 (3d Cir. 1981). "The prosecution may pursue the inquiry with contradictory witnesses . . . to show that damaging rumors, whether or not well founded, were afoot." *Michelson*, 335 U.S. at 479.

Thus, prohibiting the government from conducting this cross-examination would impair the jury's ability to properly assess the witness's credibility. A limiting instruction is particularly appropriate and adequately protects a defendant from any possible unfair prejudice. This is so especially in light of the fact that the defendant can prevent the introduction of this cross-examination simply by electing not to call character witnesses. "[W]e think defendants in general . . . have no valid complaint at the latitude which existing law allows to the prosecution to meet by cross-examination an issue voluntarily tendered by the defense." *Michelson*, 335 U.S. at 485. Hence, given the limited nature of the inquiry, an instruction informing jurors that the sole purpose of the evidence is to permit them to assess what weight to give the character testimony cures any potential prejudice to the defendant. *Id*.

## I.      Presence of Government's Representative During Trial

The Government will designate Department of Homeland Security, Homeland Security Investigations Special Agent Thomas Eyre as the Government's representative at trial. Special Agent Eyre is the case agent in this matter. Even if the Government decided to call Special Agent as a witness, case law permits him to remain in the courtroom as the

Government's representative.  *United States v. Mallis*, 467 F.2d 567, 568 (3d Cir. 1972).

### J.      Audio Recordings

The government intends to introduce audio recordings of the defendant speaking, in open court, in various immigration courts around the United States.  These records were obtained by agents of Homeland Security Investigations from EOIR headquarters in Falls Church, Virginia, and relate to EOIR removal proceedings for seven (7) separate individuals. These recordings were recorded at EOIR courts in Philadelphia, PA; New York City, NY; Miami, FL; Chicago, IL; and Hartford, CT.

The government filed a motion to admit these audio recordings at trial on May 8, 2017 (ECF No. 49); the defense responded on May 26, 2017 (ECF No. 51), and a hearing was held before this Court on June 28, 2017, to address the audio recordings' authenticity and admissibility.

At that hearing on June 28, 2017, the government presented testimony from an EOIR employee, as well as from HSI Agent Eyre.  After the hearing, this Court granted the government's motion to admit the audio recordings at trial (*see* 6/29/17 Tr. at 42:21-43:5), pending a showing of relevance at trial.  Thus, after the recordings are deemed "relevant" at trial – which they will be, given that the recordings go to the very heart of the charges in this case – because the recordings already have been deemed admissible at trial, no records custodian need appear and testify at trial to authenticate and thus admit these recordings.

V.     **TRIAL**

   The government reserves the right to call rebuttal witnesses in the event that the

defendant elects to present any defense.  Proposed jury instructions, a proposed verdict form, and

proposed voir dire have been provided to defense counsel.


         Respectfully submitted,

         LOUIS D. LAPPEN
         United States Attorney

         RICHARD W. GOLDBERG
         Chief, Economic Crimes Unit

         /s/ James A. Petkun
         JAMES A. PETKUN
         Assistant United States Attorney



Date:   January 19, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served via

ECF electronic case filing upon:

        Christopher G. Furlong, Esquire
        22 East Third Street
        Media, PA  19063
        cgfurlaw@comcast.net

        /s/ James A. Petkun
        JAMES A. PETKUN
        Assistant United States Attorney

Date: January 19, 2018